James F. Sweeney
Michael J. Carcich
Kevin J.B. O'Malley
NICOLETTI HORNIG & SWEENEY
Wall Street Plaza
88 Pine Street, Seventh Floor
New York, New York 10005-1081
(212) 220-3830
*Attorneys for Defendant*
    *Benxi Northern Steel Pipes Co. Ltd.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------x
AFRODITE SEA TRADE S.A..,

                     x

       Plaintiff

                     x

     – v. –                    **07 CV 5626 (DAB)(MHD)**

                     x

SHINE STAR SEA-TRANSPORT       **ELECTRONICALLY FILED**
PTE, LTD., *et al.*                  x

       Defendants.          x

---------------------------------------------------------x

**DECLARATION OF KEVIN J.B. O'MALLEY IN SUPPORT OF DEFENDANT**
**BENXI NORTHERN STEEL PIPES CO. LTD.'S MOTION TO DISMISS AND**
**TO VACATE PROCESSES OF MARITIME ATTACHMENT AND GARNISHMENT**

         Pursuant to 28 U.S.C. § 1746, KEVIN J.B. O'MALLEY declares under penalty of perjury

as follows:

         1.       I am an associate with Nicoletti Hornig & Sweeney, attorneys of record for

Defendant Benxi Northern Steel Pipes Co. Ltd. in the above-captioned action.  I am fully

familiar with all prior proceedings herein both from my involvement in this action and from my

review of the files maintained by my firm.

2.      Attached hereto as Exhibit "A" is a true and correct copy of pages 63-64 from Stewart C. Boyd, Andrew S. Burrows and David Foxton, *Scrutton on Charterparties and Bills of Lading* (20th ed.).

3.      Attached hereto as Exhibit "B" is a true and correct copy of *Itex Itagrani Exports SA v. Care Shipping Corp. ("The CEBU")*, [1990] Lloyd's Rep. 316 (Q.B. Com. Ct.).

4.      Attached hereto as Exhibit "C" is a true and correct copy of the Declaration of Wang Lianxue executed on February 28, 2008.

5.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:       March 10, 2008
                New York, New York

                                        /s Kevin J.B. O'Malley
                                        KEVIN J.B. O'MALLEY

# EXHIBIT

# "A"

# SCRUTTON

## ON

# CHARTERPARTIES

## and

# Bills of Lading

### *Twentieth Edition*

BY

## STEWART C. BOYD

*Of Trinity College, Cambridge, and of the Middle Temple;*
*One of her Majesty's Counsel*

## ANDREW S. BURROWS

*Of the Middle Temple; Professor of English Law,*
*University College, London; Law Commissioner for England and Wales*

AND

## DAVID FOXTON

*Of Magdalen College, Oxford, and of Gray's Inn*

LONDON
SWEET & MAXWELL
1996

(10) Where statutory duties are imposed on the "owner" of a ship, such as the payment of light dues, in the absence of express provisions in the charter, the charterer is liable if the charter is a demise, the owner if it is not.[22]

(11) A charterer not by demise cannot, since he is not in possession of the ship and so his claim is one for pure economic loss, recover as damages for negligence from a tortfeasor, who has damaged the ship, the loss of use of the ship during repairs for which time he may under the time charter remain liable to pay hire.[23]

(12) The Law Reform (Frustrated Contracts) Act 1943, applies to charters by demise (and time charters), but not to voyage charters.

(13) A charterer by demise is liable for collision caused by negligence of the demised ship.[24]

## Article 30—Charterparties not by Demise—Categories

Charterparties not by way of demise fall into two main categories: (1) time charters and (2) voyage charters.[25]

Under the ordinary form of time charter, the shipowner agrees with the time charterer to render services for a named period[26] by his master and crew to carry goods put on board his ship by or on behalf of the time charterer.[27] The shipowner's remuneration is usually termed "hire"[28] and is generally calculated at a monthly rate on the tonnage of the ship.

A voyage charter differs from a time charter in many respects, but primarily in that it is a contract to carry specified goods on a defined

[22] *Cf. The Hopper No. 66* [1908] A.C. 126; *Trinity House v. Clark* (1815) 4 M. & S. 288.
[23] *Chargeurs Réunis v. English and American SS. Co.* (1921) 9 Ll.L.R. 464. *Elliott Steam Tug Co. Ltd v. The Shipping Controller* [1922] 1 K.B. 127, 139; *Candlewood Navigation Corp. v. Mitsui O.S.K. Lines Ltd* [1986] A.C. 1. *Cf. Morrison Steamship Co. v. Greystoke Castle (Cargo Owners)* [1947] A.C. 265 at pp. 275, 279, 280, 296.
[24] *Fenton v. Dublin SS. Co.* (1838) 8 A. & E. 835. On the liability of a ship *in rem* for a collision, when the charter amounts to a demise, see *The Tasmania* (1888) 13 P.D. 110; and Art. 148. On the personal liability of the owner of a ship proceeded against *in rem*, see *The Dictator* [1892] P. 304.
[25] A charter by way of demise may be for time or for a particular voyage: see the *Cases* in Art. 28. In modern times, however, demise charters are invariably expressed to be for a period of time.
[26] It is not uncommon for the period, instead of being defined in terms of time, to be defined as the time necessary to perform a defined voyage or "trip". A charter in this form is sometimes called a "time trip" charter: see, e.g. *Marbienes Compania Naviera S.A. v. Ferrostaal A.G. (The Democritos)* [1975] 1 Lloyd's Rep. 386. In *Uni-Ocean Lines Pte. Ltd v. C-Trade S.A. (The Lucille)* [1984] 1 Lloyd's Rep. 244 a charter in time charter form had no period of time and no clearly defined voyage or voyages to be performed, but merely provided for a range of places within which the ship might be traded.
[27] *Sea and Land Securities v. William Dickinson* [1942] 2 K.B. 65, *per* MacKinnon L.J. at p. 69.
[28] On the use of the term "hire", see p. 60, ante. An insurance on "freight" may include monthly hire under a time charter: *Inman v. Bischoff* (1882) 7 A.C. 670 at p. 678, *per* Lord Blackburn but in modern chartering usage "freight" does not include the remuneration paid under a time charter: *Care Shipping Corpn. v. Itex Itagrani Export S.A.* [1993] 1 Q.B. 1. *Cf. Care Shipping Corpn. v. Latin American Shipping Corpn.* [1983] Q.B. 1005.

voyage or voyages, the remuneration of the shipowner being a freight calculated according to the quantity of cargo loaded or carried, or sometimes a lump sum freight.[29]

Developments in chartering practice have, however, tended to obscure the distinction between time and voyage charters. For example, provision is sometimes made for a specific number of consecutive voyages or for as many voyages as the vessel can perform within a certain period. Such charters present their own problems,[30] although they constitute a sub-category of voyage charters by reason of the method by which the shipowner's remuneration is calculated.

In general, the principles set out in this work are common to all types of charter, with the exception of charters by demise, although some matters, such as demurrage, arise solely in relation to voyage charters or their hybrids. A number of matters peculiar to time charters require separate treatment, and are discussed in Articles 173 to 179.

### Article 31—Chartered and Substituted Tonnage

A contract may be of such a nature that one party may be entitled to perform his obligations under it vicariously,[31] or it may be of such a nature that he must perform them personally.[32] A charterparty, as regards the shipowner's obligations, is of the latter class.[33] It follows that if a man contracts as "owner" to provide a ship or ships under a charterparty he will, in the absence of anything in the charter to indicate the contrary, be bound, and entitled, to provide his own ship or ships, and cannot, and need

---

[29] See *The Eugenia* [1964] 2 Q.B. 226 (C.A.).

[30] See, *e.g. Stems v. Salterns* (1922) 12 Ll.L.R. 385 (lump sum freight); *Ambatielos v. Grace Brothers* (1922) 13 Ll.L.R. 227 (H.L.) (cancelling clause); *Corney v. Barrelier* (1923) 16 Ll.L.R. 39 (frustration); *Dunford v. Compania Maritime Union* (1911) 16 Com.Cas. 181 (delay); *Compagnie Primera, etc. v. Compania Arrendataria* [1940] 1 K.B. 362 (deviation); *S.A. Maritime et Commerciale Geneva v. Anglo-Iranian Oil Co.* [1954] 1 W.L.R. 492 (substituted tonnage); *Hollis Bros. v. Bagley* [1958] 1 Lloyd's Rep. 484 (obligation to load by stated date); *Adamastos Shipping Co. v. Anglo-Saxon Petroleum* [1959] A.C. 133 (application of Hague Rules) and in C.A. [1957] 2 Q.B. 255 (seaworthiness, reasonable dispatch); *Suisse Atlantique v. N.V. Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361 (demurrage); *Agro Company of Canada Ltd v. Richmond Shipping Ltd* [1973] 1 Lloyd's Rep. 392 (meaning of "final discharge" in Centrocon Arbitration Clause); *Skibsaktieselskapet Snefonn v. Kawasaki Kisen Kaisha (The Berge Testa)* [1975] 1 Lloyd's Rep. 422 (completion date for last voyage read subject to tolerance of "about"); *Intermare Transport GmbH v. Tradax Export S.A. (The Oakwood)* [1977] 1 Lloyd's Rep. 263 (last voyage).

[31] *British Wagon Co. v. Lea* (1880) 5 Q.B.D. 149. Such a contract is sometimes said to be "assignable", a word more accurately limited to the right to transfer the rights, not the obligations, of a contract.

[32] *Kemp v. Baerselman* [1906] 2 K.B. 604.

[33] Lord Denman C.J. in *Humble v. Hunter* (1848) 12 Q.B. 310 at p. 317; *Fratelli Sorrentino v. Buerger* [1915] 3 K.B. 367. In the last case the shipowner succeeded because upon the facts it was found that he was ready to perform personally and not vicariously; *cf. Omnium D'Enterprises v. Sutherland* [1919] 1 K.B. 618. See also *Isaacs v. McAllum* [1921] 3 K.B. 377. In *Dimech v. Corlett* (1858) 12 Moo.P.C. 199 at p. 223, the same view was taken of the charterer's obligations.

# EXHIBIT

# "B"

46 of 47 DOCUMENTS

ITEX ITAGRANI EXPORTS SA v CARE SHIPPING CORPORATION AND OTHERS
(THE "CEBU") (No 2)

QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

*[1993] QB 1, [1992] 1 All ER 91, [1991] 3 WLR 609, [1990] 2 Lloyd's Rep 316*

**HEARING-DATES:** 21, 22, 26 March, 6 April 1990

6 April 1990

**CATCHWORDS:**

Charter-party (Time) -- Hire -- Lien on sub-freights -- Non payment of hire under head charter -- Owners advised sub-sub-charterers of non-payment of hire and of lien on sub-sub-freights -- Sub-sub-charterers paid hire to sub-charterers -- Whether owners had validly exercised rights under contractual lien on sub-freights.

**HEADNOTE:**

By a charter-party dated Oct 18, 1979 the owners (Care) let their vessel Cebu to Naviera Tolteca Inc (Navtol) for a time chartered trip lasting 17-20 months followed by a second period of 20-24 months. There was an express liberty to sub-let.

By a second charter dated Mar 3, 1980 Navtol as disponent owners sub-chartered the vessel to Latin American Shipping Corporation (Lamsco) for a period "until redelivery to actual owners". The terms under the two charters which were both in the New York Produce Exchange form, were identical including the rate of hire.

By a third charter dated July 30, 1981 Lamsco as disponent owners let the vessel to Itex for a time charter for a voyage from Portland Oregon to Bandar Abbas carrying a cargo of grain.

Each of the three charters contained in cl 18 the following provision:

That the owners shall have a lien on all cargoes and sub-freights for any amounts due under this charter including general average contributions. By Sept 25, 1981 Navtol owed Care at least one months hire. On that date Care's agents sent Itex a telex stating inter alia:

. . . according to clause 18 . . . we have a Lien upon all cargoes and all sub-freights . . . we inform you that hire due since 22/9/81 was not paid. We herewith lien any hire to be paid by you to chrs and request you to kindly remit moneys due to VSI's account . . . any payment to others will not release you from obligation after we have exercised lien.

In the event Itex paid the hire instalment due under their charter to Lamsco.

Care claimed that there had been an equitable assignment and that Itex had paid the moneys to Lamsco at their peril.

The issue for decision was whether Care effectively exercised rights under their contractual lien on sub-freights under cl 18 in respect of hire due under a sub-sub-time charter.

-- Held, by QB (Com Ct) (STEYN J), that (1) the contractual lien under cl 18 was in law an equitable assignment;

[1993] QB 1, [1992] 1 All ER 91, [1991] 3 WLR 609, [1990] 2 Lloyd's Rep 316

-- The Cebu (No 1), [1983] 1 Lloyd's Rep 302; The Ugland Trailer, [1985] 2 Lloyd's Rep 372; and The Annangel Glory, [1988] 1 Lloyd's Rep 45, applied.

(2) by 1979, when the headcharter was entered into, the vocabulary of the shipping trade had for many years used the word "hire" for sums payable under time charters and restricted the word "freight" to voyage charter-parties and bills of lading; and at all material times the ordinary meaning of the word "freight" in the shipping trade included only bill of lading freight and freight payable under a voyage charter and the 1979 charters was made with reference to that specialized vocabulary of the shipping trade;

(3) prima facie "sub freights" in cl 18 meant sub-freights payable under bills of lading or a voyage charter and there was nothing in either the printed NYPE form nor the typed additional conditions to justify the stretching of the ordinary meaning of freight to cover hire;

(4) properly construed sub-freights in cl 18 did not include sub-time charter hire; the owners' claim against the sub-sub-time charterers was not within the scope of the lien on sub-freights and the claim failed.

**CASES-REF-TO:**

Annangel Glory, The [1988] 1 Lloyd's Rep 45;
Attika Hope, The [1988] 1 Lloyd's Rep 439.
Care Shipping Corporation v Latin American Shipping Corporation (The Cebu) No 1, [1983] 1 Lloyd's Rep 302, [1983] 1 QB 1005;
Federal Commerce and Navigation Co Ltd v Molena Alpha Inc (The Nanfri), (HL) [1979] 1 Lloyd's Rep 201; [1979] AC 757; (CA) [1978] 2 Lloyd's Rep 132; [1978] QB 927;
Inman Steamship Co Ltd v Bischoff, (HL) (1882) 7 App Cas 670;
Ugland Trailer, The [1985] 2 Lloyd's Rep 372; [1986] Ch 471;
Wehner v Dene, [1905] 2 KB 92.

**INTRODUCTION:**

This was the trial of a counterclaim brought by the Care Shipping Corporation first defendants against the plaintiffs Itex Itagrani Export SA for US$92,625.00 in respect of claims arising out of a chain of New York Produce Exchange charters.

**COUNSEL:**

Mr Anthony Hallgarten, QC and Mr Duncan Matthews for the plaintiffs; Mr Bernard Eder and Mr David Foxton for the first defendants.

**JUDGMENT-READ:**

Judgment was reserved Friday Apr 6, 1990

**PANEL:** STEYN J

**JUDGMENTBY-1:** STEYN J

**JUDGMENT-1:**

STEYN J: The principal question is whether the owners of a vessel effectively exercised rights under their contractual lien on sub-freights under cl 18 of a New York Produce Exchange time charter in respect of hire due under a sub-sub-time charter.

[1993] QB 1, [1992] 1 All ER 91, [1991] 3 WLR 609, [1990] 2 Lloyd's Rep 316

### The background to the present dispute

The hearing involved the trial of a counterclaim brought by Care Shipping Corporation ("Care") against Itex Itagrani Export SA ("Itex") for US$92,625,00. The counterclaim arises out of a chain of New York Produce Exchange time charters. Care are the owners of Cebu. By a charter dated Oct 18, 1979 on the New York Produce Exchange ("NYPE") form they chartered the vessel to Naviera Tolteca Inc ("Navtol") for a time chartered trip lasting 17-20 months followed by a second period of 20-24 months. The vessel was delivered on Nov 22, 1979. Under this charter, and under other charters in the chain, there was an express liberty to sub-let.

By a second charter dated Mar 3, 1980 Navtol, as disponent owners, sub-chartered the vessel to Latin American Shipping Corporation ("Lamsco") for a period --

. . . until redelivery to actual owners under Tolteca Incorporated T/C dated 18 October 1979 unless otherwise agreed (22 March-22 June 1981).

It was also on the NYPE Form. The terms and conditions under the two charters are identical, including the rate of hire. Under the sub-charter delivery took place on Mar 29, 1980.

The third charter is dated July 30, 1981. By this charter Lamsco as disponent owners sub-sub-chartered the vessel to Itex for a time charter which turned out to be from Portland, Oregon, to Bandar Abbas, carrying a cargo of grain.

Each of the three charters contained in cl 18 the following provision:

That the owners shall have a lien on all cargoes and sub-freights for any amounts due under this Charter, including general average contributions . . .

By Sept 25, 1981 there was due by Navtol to Care at least US$263,306,25 (being one month's hire net of commissions due on Sept 22, 1981). On that date Care's agents, Fito, sent to Itex a telex purporting to exercise the lien. This telex read as follows:

. . . according to clause 18 of our c/p with naviera tolteca we have a Lien upon all cargoes, and all subfreights. In conformity with above we inform you that hire due since 22/9/81 was not paid. We herewith Lien any hire to be paid by you to chrs and request you kindly to remit monies due to vsl's account 655 217 with Hamburgische Landesbank, Hamburg. Pls be advised that any payment to others will not release you from obligation after we have exercised Lien.

It is common ground that Itex owed US$92,625 to Lamsco under the third charter. That sum became due on Sept 24, 1981. I should point out, however, that Itex does not admit that this sum was owed by Lamsco to Navtol. In any event, after receipt of the telex of Sept 25, 1981, Itex was faced with the conflicting claims of Lamsco and Care. Further exchanges, through intermediaries, took place between Care and Itex. Itex suggested that by agreement between Care and Lamsco the sum of US$92,625 should be paid into an escrow account. That was unacceptable to Care and Lamsco. Care offered a "hold harmless" letter of indemnity to Itex. That offer was not accepted by Itex. Faced with the competing claims of Care and Lamsco, Itex did not on this occasion interplead. Instead Itex made payment of US$492,625 to Lamsco on Sept 30, 1981 -- that being the instalment of hire which became due under the third charter on Sept 24, 1981.

It is Care's case that there had been an effective equitable assignment and that Itex paid the sum of US$92,625 to Lamsco at their peril. Itex argue that for a number of reasons the claim must fail. That is the dispute that I am asked to resolve.

### The earlier dispute

It is relevant to point out that the vessel was redelivered by Itex to Lamsco on Oct 17, 1981. According to a

[1993] QB 1, [1992] 1 All ER 91, [1991] 3 WLR 609, [1990] 2 Lloyd's Rep 316

provisional hire statement the sum then due and owing by Itex to Lamsco was US$101,467.00. That sum was paid into a joint banking account to await the outcome of interpleader proceedings commenced by Itex. Those interpleader proceedings, it must be emphasized, did not relate to the hire due on Sept 24, 1981 (the subject matter of the present dispute) but the last payment of hire plus accrued interest (US$101,467.55). Itex was allowed to interplead. The matter came before Mr Justice Lloyd (now Lord Justice Lloyd) in November, 1983. The contestants before him were Care and Lamsco, each claiming entitlement to the fund of US$101,467.00. Mr Justice Lloyd had to deal with the preliminary question whether Care had effectively exercised a lien on that sum, leaving over for decision in arbitration proceedings whether Care was entitled to recover against Navtol (the charterers under the head charter). The judgment of Mr Justice Lloyd is reported in the law reports: Care Shipping v Latin American Shipping Co, [1983] 1 Lloyd's Rep 302; [1983] 1 QB 1005. I will refer to the case as The Cebu (No 1).

Before Mr Justice Lloyd Care submitted that the owners' contractual lien on "all sub-freights" covers sub-sub-charter hire. The arguments of Itex are summarized by Mr Justice Lloyd as follows (at p 303, col 2; p 1010):

Mr Siberry, for Lamsco, takes two main points. First, he submits that the lien is a lien on sub-freights. In the present case what was due from Itex to Lamsco was not freight, but hire. Secondly, he submits that when cl 18 refers to sub-freights it means sub-freights, ie, freights due from Lamsco to Naviera Tolteca, and not sub-sub-freights, ie freights due from Itex to Lamsco. Thus, Mr Siberry concedes, subject only to his first point, that the owners are entitled to intercept hire payable by Lamsco to Naviera Tolteca. But he submits that nothing in the language of cl 18 entitles the owners to intercept hire payable by Itex to Lamsco. Nor, if the language did purport to allow interception at that stage, would it be effective to produce that result.

Mr Justice Lloyd rejected the arguments advanced on behalf of Itex, and he held that, subject to the determination of the precise accounting position as between Lamsco and Care, Care were entitled to the monies paid by Itex into escrow.

The issues

On behalf of Itex Mr Hallgarten has emphasized that Itex, as stakeholders, were not represented before Mr Justice Lloyd. In a detailed argument he has invited me to reconsider the points decided by Mr Justice Lloyd and also to consider a number of further arguments. The list of arguments which Mr Hallgarten asked me to consider is as follows:

(a) Whether the lien is in truth an equitable assignment;

(b) Whether the lien on "all sub-freights" covers time charter hire;

(c) Whether the lien on "all sub-freights" covers sub-sub hire;

(d) Whether there was sufficient notice of lien and in particular: (i) Whether it was necessary to and whether the notice did identify the chain of charters and/or the debts with sufficient particularity; (ii) Whether the debt to be liened was sufficiently specified;

(e) Whether the telex of Sept 25 1981 purported unilaterally to vary the place of payment under the sub-sub-charter (Philadelphia) by calling for payment in Hamburg;

(f) Whether it was necessary to give notice of the exercise of the lien along the chain;

(g) Whether in circumstances where non-payment may have an impact on an executory contract, the debtor is entitled to ignore a notice of assignment unless and until the alleged assignee obtains an injunction;

(h) Whether there is an implied term in the head charter that the lien is not to be exercised in a way which may imperil the sub-charter or sub-sub-charter;

[1993] QB 1, [1992] 1 All ER 91, [1991] 3 WLR 609, [1990] 2 Lloyd's Rep 316

(j) Whether the sum of US$92,625 was owed by Lamsco to Navtol.

In addition there is a dispute about a further sum of US$14,653,013. Itex admit that at the time the payment into escrow was made this further sum was owed by them to Lamsco and by Navtol to Care. But Itex do not admit that this sum was owed by Lamsco to Navtol. In respect of this sum Mr Eder, for Care, has asked for an order that this sum be paid into the escrow account. But it is agreed that no order for payment out of that sum could be made without giving notice to Lamsco who are technically before the Court but are unrepresented.

The documents and evidence

Primarily, the issues are questions of construction or other questions of law which can be resolved in the light of the contemporary documents and agreed facts. There are, however, three Civil Evidence Act statements. Most of the material in these statements is not now relevant but a few passages have some bearing on one or two of the issues. No oral evidence was led.

Issue 1: The nature of the lien

In The Cebu No 1 Counsel for Lamsco accepted that the contractual lien under cl 18 was in law an equitable assignment. Mr Justice Lloyd discussed the point and concluded that the concession was rightly made: at p 308, col 1; p 1015 B-G. In The Ugland Trader, [1985] 2 Lloyd's Rep 372; [1986] Ch 471 and The Annangel Glory, [1988] 1 Lloyd's Rep 45 Mr Justice Nourse (now Lord Justice Nourse) and Mr Justice Saville independently examined the same question, which was directly in issue in each case, and concluded in reserved judgments that the lien was an equitable assignment. See also The Attika Hope, [1988] 1 Lloyd's Rep 439.

In the present case Mr Hallgarten argues that "lien" should be given its natural and ordinary meaning as representing a right in respect of matters within the lienor's power and control. That is the import of the lien in relation to cargoes, and the same should apply in relation to sub-freights. It is said that an obvious case where a lien in relation to sub-freights may be applicable is where under a bill of lading freight is prima facie due to the owner -- albeit that the owner, who is technically a principal to the bill of lading, is an agent for the time charterer and must account to the time charterer for such freight: Wehner v Dene, [1905] 2 KB 92.

It seems to me that Mr Hallgarten's interpretation is an artificially restrictive one. After all it is a lien on all sub-freights. The views expressed on this point by Mr Justice Lloyd in The Cebu No 1 by Mr Justice Nourse in The Ugland Trader and by Mr Justice Saville in the Annangel Glory seem to me, if I may say so, to reflect a realistical commercial approach to the construction of cl 18. I do not propose to struggle against an interpretation which to me seems tolerably clear. I rule against Itex on the first point.

Issue No 2: Does sub-freights cover sub-charter hire?

The issue can be stated quite simply: Is sub-charter hire or sub-sub-charter hire "sub-freights" within the meaning of cl 18?

It may be objected that in so defining the issue I have assumed what needs to be proved, namely that the sum payable by a time charterer is, and has at all relevant times been, categorized as hire and not as freight. Indeed in his judgment Mr Justice Lloyd states with reference to the head time charter and the sub-time charter: (at p 304, col 1; p 1009 D-E):

The terms and conditions of the two charters are identical, including the rate of freight.

The printed NYPE form, which is the amended form which has been in use since 1946, consistently refers to the sum payable by the charterers as "hire". Moreover, the typed clauses of all three charters involved in the present case consistently use the word "hire". It therefore seems correct to frame the issue as I have done.

[1993] QB 1, [1992] 1 All ER 91, [1991] 3 WLR 609, [1990] 2 Lloyd's Rep 316

Mr Justice Lloyd stated (at p 305, cols 1 and 2; pp 1010 H-1011 D):

I accept, of course, that freight in the strict sense means bill of lading freight or freight earned under a voyage charter. But even in the 19th century the word "freight" was frequently used in the wider sense to include what was called "time freight" or "time chartered freight". In other words, it covered any form of remuneration derived from the employment of a vessel. In Inman Steamship Co Ltd v Bischoff, (1882) 7 App Cas 670 in a marine insurance context, it was held that a policy on freight covered loss of hire under a time charter. Lord Blackburn said, at p 678:

The construction of the policy remains that the underwriters are to make good any loss occasioned to the subject-matter of the insurance in this policy described as "freight outstanding". "Freight", says Lord Tenterden CJ in Flint v Flemyng [(1830) 1 B & Ad 45 at p 48], "as used in the policy of insurance, imports the benefit derived from the employment of the ship": so that description covers the monthly hire of the ship for time.

In the 20th Century there has been a progressive tendency to assimilate, so far as possible, the rules relating to voyage charters and time charters. This seems to me a sensible approach, particularly since the advent and rapid growth of the time charter trip. No doubt the time charter trip has many advantages over the voyage charter. For one thing it avoids the hideous complexities of demurrage. But it would be an odd consequence of the charterers opting to enter into a sub-time charter trip that the owners should inadvertently be deprived of their security on sub-freights. I would hold, following Lord Blackburn in Inman Steamship Co Ltd v Bischoff, that the lien on sub-freights conferred by cl 18 includes a lien on any remuneration earned by the charterers from their employment of the vessel, whether by way of voyage freight or time chartered hire. [My emphasis.]

Mr Justice Lloyd then considered observations in the Court of Appeal in Federal Commerce and Navigation Co Ltd v Molena Alpha Inc (The Nanfri), [1978] 2 Lloyd's Rep 132; [1978] QB 927 to which I will turn in due course. He stated at p 306, col 2; p 1012 F-G:

. . . I can see no reason in a construction which would make the owners' security depend on whether the sub-charter is a voyage charter or a time charter trip. In my view the parties must be taken to have used the word "sub-freight" in cl 18 to cover both. This is the view expressed tentatively by the authors of Wilford, Time Charters, 1st ed (1978) p 222. I accept and adopt that view. I would therefore reject Mr Siberry's first argument. [My emphasis]

This reserved judgment, and its detailed reasons, provide powerful persuasive support for Care's case. But I have been asked to re-examine the point in the light of the much fuller argument which has been addressed to me in the present case.

It will have been observed that Mr Justice Lloyd observed that it would be odd, and make no sense, to distinguish in relation to "all sub-freights" in cl 18 between a voyage charter-party and a sub-time charter trip. Certainly, there are similarities in commercial purpose. But Mr Justice Lloyd's holding must mean that "all sub-freights" in cl 18 cover not only hire under a sub-time charter trip but hire payable under all sub-time charters. It would be impossible, as a matter of language, to bring one species of time charter hire within the words "all sub-freights" but not others.

Mr Justice Lloyd would have had, of course, very much in mind the differences between a voyage charter-party and a time charter-party. But it may be a useful exercise to spell out some of those differences. Under a voyage charter-party a shipowner undertakes to carry a cargo from one port to another. Under a time charter not by demise the shipowner undertakes to render services by his master and crew to carry the goods which are put on board his ship by or on behalf of the charterer: Scrutton on Charter-parties, 19th ed p 47. The financial consequences of the two types of charter are widely different. For example, typically the following items are for the time charterer's account under a time charter: fuel, port charges, stevedoring charges, cleaning of holds, demurrage, ballast, water, commission and brokerage. Under a voyage charter-party those items are typically for the account of the owners. The accounting position is therefore very different under time charters and voyage charters. Moreover, vital clauses invariably found in time charters, such as the off-hire clause and the withdrawal clause, are not appropriate to voyage chartering. And,

[1993] QB 1, [1992] 1 All ER 91, [1991] 3 WLR 609, [1990] 2 Lloyd's Rep 316

because of the emphasis that has been placed on the fact that the sub-sub-charter in this case is for a trip, it must be emphasized that a time charter for a sub-chartered trip generally shares the distinctive features of time charters.

It is perfectly true, as Mr Justice Lloyd observed, that in the 19th century the word "freight" was frequently used in a wide sense to include what was called "time freight" or "time chartered freight". I would accept that the word "freight" was used in this wide sense well into this century. Examples of this usage are to be found in earlier editions of Scrutton on Charterparties and Carver's Carriage of Goods by Sea: see the 12th (1925) ed of the former, and the 8th ed (1938) of the latter. What is crystal clear is that a change in the use of the word "freight" in the shipping trade came about in modern times. In Ivamy's Dictionary of Shipping Law, 1984 the relevant definitions are as follows (at pp 44 and 56):

Freight: The remuneration payable in respect of the carriage of goods by sea under a voyage charter-party or bill of lading.

Hire: A sum of money to be paid to the ship owner by a charterer under a time charter-party for the use of the vessel.

Brodie's Dictionary of Shipping Terms, 1985 is to the same effect: pp 61 and 71. These specialist dictionaries were, of course, published after 1979 when the head charter was concluded. But they are testimony to the fact that some time before their publication the specialist vocabulary of the shipping trade had come to associate freight with voyage charters and hire with time charters.

Given that the change would probably have been a gradual one, there was some debate as to when exactly the change can be said to have taken place. It is impossible to give a precise answer. Legal textbooks probably tend to be a little behind the times in reflecting changes in specialist vocabulary. It is therefore significant that in the 15th ed of Scrutton on Charter-parties, which was published in 1958, at p 391, reference is made to the fact that remuneration under a time charter is more usually called hire rather than freight. It would seem from the 9th ed of Carver's Carriage of Goods by Sea, which was published in 1952, at p 804, that the learned editor also noted the change that had come about. Then one has the fact that the widely used NYPE form, which was last amended in 1946, consistently uses the word "hire" for the sums payable by charterers under a time charter. By 1950, at least, the popular Baltime consistently called the periodic payments under a time charter "hire". In The Nanfri, which concerned time charters concluded in 1974, Lord Denning, giving judgment in 1978, said (at p 139, col 1; p 973):

At one time it was common to describe the sums payable under a charter-party as "freight". Such description is to be found used by Judges and textbook writers of great distinction. But in modern times a change has come about. The payments due under a time charter are usually now described as "hire" and those under a voyage charter as "freight".

See also the observations of Lord Justice Goff, at p 144, col 2; p 982D. The actual decision in The Nanfri, which concerned the question whether the rule excluding deductions from freight also applies to hire does not assist. But the observations of Lord Denning do show that in modern times a change came about.

My view is that the change came about before the publication of the 1946 amendment of the NYPE form. But one is not concerned with the "original intent" of cl 18. The relevant time is the date upon which the parties contracted upon the standard terms of the NYPE form. In the case of the head charter that was in 1979. By that time, I am satisfied, the vocabulary of the shipping trade had for many years used the word "hire" for sums payable under time charters, and restricted the word "freight" to voyage charter-parties and bills of lading. No doubt there was not complete uniformity of usage but about the general understanding of the meaning of those words there cannot be much doubt. In one of the passages which I have quoted from Mr Justice Lloyd's judgment he said that "in a strict sense" freight means bill of lading freight and freights earned under a voyage charter-party. My view on the materials deployed in this case is that this had been the ordinary or popular meaning of the word "freight" for many years. And in 1979 the head charter was made with reference to that specialized vocabulary of the shipping trade.

[1993] QB 1, [1992] 1 All ER 91, [1991] 3 WLR 609, [1990] 2 Lloyd's Rep 316

Mr Justice Lloyd adopted the tentative view of Wilford, Time Charters, 1st ed (1978), at p 222. The learned authors stated in relation to cl 18 of the NYPE form:

Sub-freights probably includes sub-time charter hire and might include any monies which could be regarded as monies derived from the employment of the vessel by the time charterers.

This expression of opinion is based solely on the decision in Inman Steamship v Bischoff, (1882) 7 App Cas 670 which Mr Justice Lloyd also relied on. The change in use of the word "freight", in a charter-party context, which I have described, came long after that decision. But the more important point is that Inman is only authority on the construction of insurance policies. And, in insurance parlance, "freight" has at all material times had specialized and wider meaning, restricted to use in an insurance context. Arnould, Law of Marine Insurance and Average, 16th ed, pointed out in par 311:

The word freight in insurance law has a more extensive signification than in general law of shipping and is used comprehensively to denote the benefit derived by the owner from the employment of his ship.

It follows that customary meaning of the word freight in an insurance context cannot assist. And the sole foothold for Wilford's tentative view must on examination be held to have disappeared.

It follows that I conclude that at all material times the ordinary meaning of the word freight, in the shipping trade, included only bill of lading freight and freight payable under a voyage charter-party. That is important because the standard terms of the NYPE form must be construed in the light of the ordinary meaning of the word freight as used in the shipping trade.

Prima facie "sub-freights" in cl 18 mean sub-freights payable under bills of lading or a voyage charter-party. One accepts immediately that the word "sub-freights", like any other word in a contract, might receive a colour from the context, eg, if the word freight had been used in the typed clauses instead of hire. But I find nothing in either the printed NYPE form nor in the typed conditions to justify the stretching of the ordinary meaning of freight to cover hire. On the contrary, the consistent use of the word "hire" in both parts of the charters points the other way.

Mr Eder sought to rely on two points. First, he emphasized that the words are "all sub-freights". In the context "all" does not extend the meaning of sub-freights: it merely conveys that it relates not to some sub-freights but to all. The plural "sub-freights" also does not assist because, on any view, it covers both bills of lading sub-freights and sub-freights under a voyage charter-party. Secondly, it is said that the words "liberty to sublet" help. Clearly, the liberty to sub-let extends to both voyage charter-parties and time charter-parties. But it does not indicate one way or the other that "sub-freights" was used in a wider than usual sense.

In construing an integrated written contract, the approach to be adopted is not to ask what the parties intended by entering into the contract, but to ask what is the meaning of their contract. In other words, the Court is only concerned with the expressed intention of the parties. The unexpressed objective of parties are usually conflicting, and speculation about it is not permissible. Nevertheless, I accept that the more unreasonable an interpretation is the heavier is the burden of showing that it is compelled by the language. Mr Justice Lloyd in terms said that it would be an odd result if the sub-freights only covered bill of lading freight and freight under a voyage charter-party and not hire under a sub-time charter. Even if that were right, it would still be a drastic step to stretch the word sub-freights to cover sub-charter hire. But can it be demonstrated from the contracts that it would be such an odd result to rule that it does not cover hire?

Clause 18 would remain fully effective in relation to bill of lading freights and freight under voyage charter-parties. The fact that it has no operative effect if the sub-charter is a time charter does not by itself warrant any stretching of the language of cl 18. After all, if the charterers stipulate for prepaid bills of lading the lien clause is inoperative. But, as Lord Wilberforce pointed out in The Nanfri in the House of Lords, one must not attribute too much force to the lien clause: Federal Commerce v Molena Alpha, [1979] 1 Lloyd's Rep 201 at p 206, col 1; [1979] AC 757, at 777 G.

[1993] QB 1, [1992] 1 All ER 91, [1991] 3 WLR 609, [1990] 2 Lloyd's Rep 316

Moreover, I am not willing to assume, even if the exercise were permissible, that the shipping trade or the parties would have regarded the result as odd. Almost certainly there would have been divergent views. And one of the factors militating against an extended meaning being attributed to "sub-freights" would be the fact that the accounting position under any time charter is more complicated than under a voyage charter. This would render the exercise of rights of lien in respect of hire under a sub-time charter more complicated than in respect of freights under a voyage charter-party. It is sufficient to say that there may be good commercial reasons why sub-time charter hire was not mentioned. It would be wrong to seek to make a judgment that there are no such reasons, and on that basis to stretch the language of the contract. This is particularly important in relation to a standard form document like the NYPE form, which is the product of negotiations in which diverse interests are consulted. To speculate about unexpressed intentions in relation to standard terms, which are the product of compromises struck in what used to be called smoke filled rooms, is an unrewarding exercise.

For my part I am satisfied that properly construed "sub-freights" in cl 18 does not include sub-time charter hire.

But there is another way of looking at the matter. Let it be assumed (contrary to my conclusion) that the words "all sub-freights" in cl 18 are ambiguous in the sense of being capable of distinct wider and narrower meanings. In that event how is this issue to be resolved between Care (the owners) and Itex (the sub-sub-time charterers)? Is the impact of the lien clause on third parties relevant if cl 18 is truly ambiguous? There is apparently no authority directly in point. But it seems relevant to bear in mind that in the development of our contract law the position of third parties has not been entirely ignored. The Court will not order a rectification, which would be operative against a third party, unless the third party is a purchaser with notice. Then there is the rule of English law that subsequent conduct of parties to a written contract, even if it shows how they have in practice interpreted the contract, is inadmissible in aid of construction. It is a rule which does not appeal to commercial men. But my understanding is that one, but not the only, reason for this rule is to protect the position of third parties, who in commerce frequently have to rely simply on what appears on the face of the contract. If this reflects the policy of our contract law, it would not be right, in construing the lien clause, to ignore entirely its impact on the third party against whom it is sought to enforce the lien.

Let me examine, in a general way, how a third party's interests may be affected by a wide interpretation of "sub-freights". Under a voyage charter-party identification of sub-freights will usually cause little difficulty. Under a sub-time charter-party the periodic payments represent, usually, a balance of account consisting of credits (eg, ballast bonus, bunkers, hire, extra war risk insurance) and, on the other hand, debits (eg off-hire, return of insurance premiums, indemnities in respect of disponent owners' items and various damages claims). In practice it may therefore not be a simple matter to identify what is said to be the "sub-freights" element of the periodic payment. This may place the third party in a difficult position.

Moreover, the third party faces the spectre of the possible withdrawal of the vessel if he does not pay the disponent owners on the agreed dates. The sub-charter is likely to contain a withdrawal clause (as did all the charters involved in the present case) in terms of which the disponent owner may withdraw the vessel if hire is not promptly paid, or is not paid after expiration of a short period of notice. Having received a notice of assignment, the sub-time charterer may be faced with a difficult decision: "Do I pay the headowners (the assignees) or the time charterers (with whom I contracted) or do I resort to interpleader proceedings?" And constraints of time may not allow resort to interpleader proceedings.

In my view these third party interests are relevant to the construction of the lien clause. Only a clear lien clause should be enforceable against the third party. In the event of a real ambiguity the lien clause should be construed against the party seeking to rely on it. If that is right, I would in any event resolve any doubt against Care, ruling that they have not demonstrated a clear right against the third party.

For all these reasons, I have come to the conclusion that on the point under consideration I ought not to follow the judgment of Mr Justice Lloyd. In my view the owners' claim against the sub-sub-time charterers of the vessel is not within the scope of the lien on sub-freights. It follows that the claim fails.

[1993] QB 1, [1992] 1 All ER 91, [1991] 3 WLR 609, [1990] 2 Lloyd's Rep 316

The other issues

Having come to a clear conclusion, which disposes of the case, I do not intend, in this case, to deal with the large number of other issues raised by Mr Hallgarten.  It seems to me more important that I should expeditiously decide the concrete dispute between the parties.

**DISPOSITION:**

Judgment accordingly.

**SOLICITORS:**

Middleton Potts; Holman Fenwick & Willan.

# EXHIBIT

# "C"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
AFRODITE SEA TRADE S.A..,

                   x

          Plaintiff

                   x

     – v. –                 **07 CV 5626 (DAB)**

                   x

SHINE STAR SEA-TRANSPORT       **ELECTRONICALLY FILED**
PTE, LTD., *et al.*           x

         Defendants.     x

-------------------------------------------------------x

## DECLARATION OF WANG LIANXUE
## IN SUPPORT OF MOTION TO DISMISS

         Pursuant to 28 U.S.C. § 1746, WANG LIANXUE declares under penalty of perjury as follows:

         1.      I am the General Manager of Benxi Northern Steel Pipes Co. Ltd. ("Benxi"), a named Defendant herein.

         2.      I make this Declaration based upon my personal knowledge of the facts and circumstances herein.

         3.      Benxi is engaged in the business of producing and selling all kinds of steel pipes.

         4.      On or about April 25, 2007, Benxi sold a shipment of steel pipes to East Diamond Inc. ("East Diamond").

         5.      The shipment, which consisted of 105 pieces weighting a total of 249.47 MT, was sold to East Diamond "free on board" ("FOB"). The FOB point was the port of Tianjin.

         6.      The shipment was tendered by Benxi to Asia Access Express Co. Ltd. ("Asia Access"), a freight forwarder, at the port of Tianjin. Asia Access then issued a bill of lading to

Benxi (B/L No. AAL/JED 040024), a copy of which is attached hereto as Exhibit "A." The bill of lading issued by Asia Access is marked "Freight Collect."

7.     Upon information and belief, the cost to ship the steel pipes was approximately US$204.00 per metric ton. However, because the shipment was sold FOB, Benxi was not responsible for paying any of the shipping costs (*i.e.*, freight).

8.     Sometime after the steel pipes were tendered to Asia Access, Benxi received correspondence from Hewett & Co. claiming that Benxi was responsible for outstanding hire under a charter party for the M/V ALTAIR.

9.     Benxi advised Hewett & Co. on September 17, 2007 that Benxi had not shipped any goods aboard the M/V ALTAIR. Rather, as I have already stated, Benxi sold the goods FOB to East Diamond and, therefore, it did not have any obligation to pay freight for the cargo of steel pipes shipped aboard the M/V ALTAIR. A copy of Benxi's correspondence is attached hereto as Exhibit "B."

10.     In response, Hewett & Co. sent a facsimile letter on September 17, 2007 claiming that Benxi was responsible for the unpaid hire because it was allegedly named as the shipper under "B/L [bill of lading] no XJ12," a copy of which was attached to the facsimile. A copy of Hewett & Co.'s facsimile and the bill of lading are attached hereto as Exhibit "C."

11.     Benxi had not, however, seen this bill of lading (*i.e.*, XJ12) prior to the facsimile from Hewett & Co.

2

12. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:    February 28, 2008

Benxi City, People's Republic of China

WANG LIANXUE

# EXHIBIT

# "A"

Shipper

BENXI NORTHERN STEEL PIPES CO., LTD.
NO. 138 YUMING ROAD MINGSHAN DISTRICT,
BENXI CITY, CHINA
T: 86-414-726-1001 F:86-414-726-8888

B/L No. AALJJED-040024

Consignee

TO RUBY STAR PTY LTD

ASIA ACCESS EXPRESS CO. LTD

# BILL OF LADING

Received by the Carrier the Goods as specified below in apparent good
order and condition unless otherwise stated, to be transported to such place
as agreed, authorized or permitted herein and subject to all the terms and
conditions appearing on the front and reverse of this Bill of Lading to which
the Merchant agrees by accepting the Bill of Lading, any local privileges and
customs notwithstanding.

Notify Party

EAST DIAMOND INC. 2F-1, NO. 5, JINZHOU
STREET TAIPEI, TAIWAN

The particulars given above as stated by the shipper and the weight, measure,
quantity content and value of the Goods are unknown to the Carrier.

In WITNESS where of three original Bills of Lading has been signed if
not otherwise stated before one of which to be completed the other(s) to be void.

| Ocean Vessel | Voy. No. |
|---|---|
| ALTAIR | V.0704 |
| Place of Receipt | Port of Loading |
| | TIANJIN SEAPORT |

If required by the Carrier three original Bills of Lading must be surrendered
duly endorsed in exchange for the Goods or delivery order.

| Port of Discharge | *Final Destination (For the Merchant's Reference Only) |
|---|---|
| JEDDAH PORT** | |

| Marks & Numbers | No. of P'kgs. or Units | Kind of Packages or Units; Description of Goods | Gross Weight | Measurement |
|---|---|---|---|---|
| N/M | 86 BUNDLE(S) | SHIPPER'S LOAD, COUNT & SEAL (86XSHPT) CONTAINERS S.T.C. | 249.47 MT | |
| | | ** SAUDI ARABIA FOB TIANJIN SEAPORT STEEL PIPE 1 24"X9.5MMX12 METER Q'TY : 6 PCS 2 30"X9.5MMX12 METER Q'TY: 3 PCS 3 36"X9.5MMX12 METER Q'TY: 10 PCS 4 48"X9.5MMX12 METER Q'TY : 22 PCS 5 52"X11.9MMX6 METER Q'TY : 16 PCS 6 52"X10.3MMX6METER Q'TY : 48 PCS TOTAL Q'TY : 105 PCS AS PER P/NO.PI07602 DOC CREDIT NUMBER:7UH1700011001 CLEAN ON BOARD : MAY,05, 2007

85 BUNDLES = 105 PCS | | |

SHIPPED ON BOARD
DATE:
Apr.25,2007

| TOTAL NUMBER OF PACKAGES OR UNITS (IN WORDS) | SAY EIGHTY SIX(86XSHRU)CONTAINERS ONLY |
|---|---|

| FREIGHT & CHARGES | Revenue Tons | Rate | Per | Prepaid | Collect |
|---|---|---|---|---|---|
| | | | | FREIGHT COLLECT | |

| Ex Rate | Prepaid at | Payable at | Place of B(s)/L Issue APR.25,2007 | Dated |
|---|---|---|---|---|
| @ | Total Prepaid in Local Currency | Number of Original B(s)/L THREE(3) | ASIA ACCESS E... | |

For Delivery of Goods Please Apply To
ASIA ACCESS EXPRESS CO. LTD
TEL:756-2231-6519 ATTN: MR. MIAO

AS CARRIER

# EXHIBIT

# "B"

 **Benxi Northern Steel Pipes Co ., Ltd.**

北   台   No.138 YUMING ROAD, MINGSHAN DISTRICT, BENXI CITY, LIAONING PROVINCE CHINA

**Dear Sir:**

OUR COMPANY-BENXI NORTHERN STEEL PIPES CO.,LTD RECEIVE THE FAX ABOUT "ALTAIR" ARBITRATION CLAUSE.

WE INSPECT OUR DOCUMENT FOR "ALTAIR" V0704 FROM TIANJIN PORT TO JEDDAH PORT AT MAY,05,2007.BUT WE DON'T TRANSPORT ANY GOOODS BY "ALTAIR"-C/P 23.3.07.

BY ANOTHER WAY WE SOLD THE GOODS TO EAST DIAMOND INC. (IT ALSO NAMED RUBY STAR PTY LTD) BY FOB CLAUSE.SO WE DONOT HAVE ANY OBLIGATIONS FOR PAYMENT FREIGHT.

PLS CONTACT MS.SUN OR MS.LIN,THE DETAILS AS FOLLOW:

MS.SUN/LIN

EAST DIAMOND INC.

EDMITW@GIGA.NET.TW

EASTDIAMOND@XUITE.NET

T:886-2-2521-8067

F:886-2-2521-8495

WE SEND OUR B/L TO YOU AS ANNEX.

BEST REGARDS

POWER

# EXHIBIT

# "C"

17-SEP-2001  18:04          HEWETT & CO                              0032104136664    P.01/04



## HEWETT & CO

MARINE CLAIMS ADJUSTERS

Benxi Northern Steel Pipes Co. Ltd.,     Our Ref.:     ALT/23.3.07 &
                                                       Bs/L LJ & XJ/RAH
China.
BY FAX NO: 00 (8) 86-414-726-8888 and     Date:        17 September, 2007
00 (8) 86 414 585 8213

Dear Sirs,

<u>"ALTAIR" – C/P 23.3.07</u>
<u>Bs/L: LLANYUNGANG, CHINA: LJ01-05, LJ08, LJ10, LJ13, LJ15-LJ31;</u>
<u>AND</u>
<u>BS/L: XINGANG, CHINA: XJ01A-C,XJ02, XJ07-8, XJ10-XJ17, XJ18A-C,</u>
<u>XJ19A-B, XJ20-XJ28</u>

Thank you for your latest fax of earlier today.

Please note that Benxi Northern Steel Pipes is named as Shipper under B/L no XJ12 (copy attached). You are therefore contractually bound by the terms of the contract of carriage, contained in and/or evidenced by the B/L, which specifies, inter alia:

"hire payable as per C/P dd 23.03.07 between Owners Afrodite SeaTrade SA and Charterers Shine Star Sea Transport PTE Limited".

The hire payable under the named Charterparty remains outstanding. The terms of the contract of carriage set out in the Charterparty also include an arbitration clause, which calls for London arbitration and English law. Please therefore confirm the appointment of your intended arbitrator, as requested in our notice sent to you on 10 September, 2007.

If we do not hear from you within 7 clear days from our last fax (i.e. by Thursday 20 September, 2007) we will proceed to appoint Mr. Bruce Harris as sole arbitrator. Please note, however, that Shippers Shenyang Sanyo Building Machinery Co. Ltd and NingBo Minmetals & Machinery Imp. & Exp. Corp. have appointed London solicitors and have notified us

71 NOTARA STREET, PIRAEUS 185 35 GREECE
TEL.: (+30) 210 4138 660 (5 LINES). FAX: (+30) 210 4138 664
E-MAIL: hewett@otenet.gr

of the appointment of Mr. Alan Oakley as their arbitrator in respect of this reference.

We look forward to hearing from you accordingly.

Yours truly,

Hewett & Co.

17-SEP-2001  18:04      HEWETT & CO                      0852104138664    P.03/04
Page 2

CODE NAME: "CONGENBILL". EDITION 1994

Shipper

BENXI NORTHERN STEEL PIPES CO., LTD.
NO.138 YUMING ROAD MINGSHAN DISTRICT, BENX
CITY, CHINA T:86-414-726-1001 F:86-414-726-8888

**BILL OF LADING**
TO BE USED WITH CHARTER-PARTIES

B/L No.

Reference No.                                          XJ12

Consignee

TO RUBY STAR PTY LTD.

Notify address

EAST DIAMOND INC.2F-1, JINZHOU STREET, TAIPEI,
TAIWAN

**ORIGINAL**

Vessel            Port of loading
ALTAIR V.0704    XINGANG,CHINA
Port of discharge
JEDDAH PORT

Shipper's description of goods                                    Gross weight

|  | 86 BUNDLES<br>(105 PCS) |  |  |
|---|---|---|---|
| N/M |  | STEEL PIPE<br>DOC.CREDIT NUMBER:7UH1700011001 | 249.47MT |
|  |  | FIOS TERMS |  |
|  |  | HIRE PAYABLE AS PER C/P DD 23.03.07<br>BETWEEN OWNERS AFRODITE SEATRADE<br>S.A. AND CHARTERERS SHINE STAR SEA-<br>TRANSPORT PTE LIMITED |  |
|  |  | FOR REMARKS ON THE CONDITION OF<br>CARGO SEE THE ATTACHED SCHEDULE |  |

TOTAL: EIGHTY SIX BUNDLES ONLY.

(of which                    on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

Freight payable as per
CHARTER-PARTY dated .................................

FREIGHT ADVANCE.
Received on account of freight:

....................................................................

Time used for loading ..........  ....... days ...................... hours.

**SHIPPED** at the Port of Loading in apparent good order and
condition on board the Vessel for carriage to the Port
of Discharge or so near thereto as she may safely get the goods
specified above.
Weight, measure, quality, quantity, condition, contents and value
unknown.
IN WITNESS whereof the Master or Agent of the said Vessel has signed
the number of Bills of Lading indicated below all of this tenor and date,
any one of which being accomplished the others shall be void.

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

Freight payable at                    Place and date of Issue
                                      TIANJIN,CHINA

Number of original Bs/L               Signature

          THREE(3)

C.15  Printed and sold by
Witherby & Company Limited, 32/36 Aylesbury Street,
London EC1R 0ET.
Tel. No. 0171 251 5341   Fax No. 0171 251 1296
by authority of The Baltic and International Maritime Council,
(BIMCO) Copenhagen.