UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
AFRODITE SEA TRADE S.A.,                          07 CV 5626 (DAB)

                Plaintiff,

        -against -                                    **DECLARATION OF ROY**
                                                        **ALBERT HEWETT PURSUANT**
SHINE STAR SEA-TRANSPORT PTE. LTD.,               **TO 28 USC § 1746**
NINGBO MINMETALS & MACHINERY
IMP. & EXP. CORP., SHENYANG SANYO
BUILDING MACHINERY CO. LTD., BENXI
NORTHERN STEEL PIPES CO. LTD., and
RILICO SINGAPORE PTE. LTD.,

                Defendants.
------------------------------------------------------------x

I, Roy Albert Hewett of 71, Notara Street, Piraeus 185 35 Greece, pursuant to section 1748 of title 28 of the United States Code hereby declare and say the following under penalty of perjury:

1. I am the President of Hewett & Co. Inc, a claims consultancy and adjusting company I set up just over 10 years ago, to provide a service principally to the Greek shipowning community. Virtually the whole of my work is involving the resolution of contractual shipping disputes by way of London arbitration. I am a solicitor of the Supreme Court of England and Wales, with 37 years of post qualification experience, for all but the first 6 months in the maritime field, holding a current practicing certificate, and I am a supporting member of the London Maritime Arbitrators Association. I am also admitted as a solicitor in Hong Kong.

2. I am currently representing Afrodite Seatrade S.A. ("Afrodite") in London arbitration proceedings brought by Afrodite against each of the Defendants herein. (I will refer hereafter to the Defendants as Shine Star, Ningbo, Shenyang, Benxi and Rilico respectively, and to the last 4 named collectively as "the Shippers".) As such, I am fully familiar with the factual and legal issues surrounding this matter.

3. Insofar as the contents of this declaration are within my own knowledge, they are true. Insofar as the contents of this declaration are not within my own direct knowledge, there are true to the best of my information and belief, being derived from my instructions on behalf of Afrodite.

4. I submit this declaration in opposition to the motion of Defendant Benxi Northern Steel Pipes Co. Ltd. to vacate the attachment order herein.

THE FACTS

5. Afrodite had chartered their ship "Altair" to Shine Star by a trip time charter dated 23rd March 2007 (hereinafter "the Charterparty"). In the event the trip was from 3 ports in China, at each of which cargo was loaded on board, to Jeddah in Saudi Arabia, where discharge was to be effected. From the very outset of the charter service, Afrodite had concerns about the ability of Shine Star to perform their financial obligations thereunder, that is to say to pay the hire due to Afrodite. The first hire installment was paid in installments and not in accordance with the terms of the charterparty. They also had concerns about the practicality of exercising lien over the cargo in Jeddah.

6. In consequence Afrodite caused to be issued Bills of Lading, which expressly incorporated the terms of the charterparty. With respect to Benxi, the applicable Bill of Lading and the governing Contract of Carriage between Afrodite and Benji, was XJ12. As the Court will see from the content of exhibit C to the declaration of Wang Lianxue filed herein, Bill of Lading XJ 12 provided on its face:

> "Hire payable as per C/P DD 23.03.07 between Owners Afrodite Seatrade S.A. and Charterers Shine Star Sea- Transport Pte. Ltd."

I attach hereto a true copy of the charterparty marked "RAH1" and a true copy of XJ12 marked "RAH2." "RAH2" also contains a copy of the attachment to Bill of Lading XJ12, which has been omitted from the copy exhibited at "C" to the declaration of Wang Lianaxue. The attachment contains the record of the pre-shipment damage to the cargo. The terms and conditions of the charterparty were incorporated by the standard Congenbill terms on the reverse, a specimen of which is attached at page 3 of "RAH2", as received by Afrodite from the Master. The arbitration and law clauses of the charterparty are expressly incorporated. The above endorsement was inserted to protect Afrodite from the possibility of default by Shine Star and to ensure that Afrodite received their entitlement to remuneration for performance of the contractual "trip", to carry and discharge the cargo at destination.

7. The cargo, when loaded, carried pre-shipment damage, which was remarked upon the relevant mate's receipts. Again, principally because Afrodite were concerned (correctly as it turned out) that Shine Star might cause clean Bills of Lading to be issued not in conformity with the mates' receipts (and, therefore, not in accordance with the terms of the charterparty), they ensured that signed receipts were given by the Shippers or their representatives in exchange for the original authorised Bills of Lading (hereinafter "the Owners' Bs/L"). A true copy of the receipt covering the Bill of Lading in question, XJ12, is attached hereto marked "RAH3". The receipt acknowledges that Bill of Lading XJ12 is the only authorised Bill of Lading.

8. Following discharge of the cargo in Jeddah, it transpired that Shine Star had issued a second set of Bills of Lading, which did not carry the remarks as to the pre-shipment condition of the cargo, but which named Shine Star as the Carrier. I now see that it is asserted by Benxi that a company named Asia Access Express Co. Ltd. (hereinafter "Asia Access"), who are unknown to Afrodite, issued a Bill of Lading covering the particular cargo shipped by Benxi. As is apparent, from the document at exhibit "A" to the declaration of Wang Lianxue, Asia Access signed as Carrier. They had no authority to do so in any way, which could prejudice Afrodite's rights under Bill of Lading XJ12. Benxi had previously received via their forwarding agents Bill of Lading XJ12, one of the Owners' Bs/L, and it was on the terms thereof that the cargo was received by Afrodite for carriage to the discharge port of Jeddah. However I must draw the Court's attention to a serious discrepancy, which arises on the documents. At exhibit "B" to the declaration of Wang Lianxue filed herein, the Court will find a copy of a fax sent to my company by Benxi. It is undated, but I can confirm, by reference to the response, exhibited by Wang Lianxue as Exhibit "C", that it was sent on 17th September 2007. The final sentence reads:

"We send our B/L to you as annex."

I exhibit hereto as "RAH4" true copies of the fax and its attachment, as received by my company. The attachment to Benxi's fax is clearly a carbon copy showing the entries inserted on the Asia Access Bill of Lading. I invite the Court to take note of the date appearing about three quarters of the way down the right hand side of the page and, again, a few lines under the words "Freight Collect". That date is 5th May 2007. Yet on Exhibit "A" to Wang Lianxue's declaration the date appears as "Apr 25, 2007". The spaces where the dates appear correspond with the position of the dates on the attachment to the fax. At the very least this must cast doubt upon the authenticity of the document at the said Exhibit "A". Further, I would suggest that, since the cargo is said in that document to be:

"Clean on board: May 05, 2007",

it is inherently likely that the document at Exhibit "A" has been manufactured, since it is impossible that a document that is purportedly signed on April 25, 2007 can confirm that goods were loaded "clean" onboard the vessel on May 5, 2007. This document would also reflect upon the totality of the evidence of Wang Lianxue. However that is a matter for determination by Mr. Bruce Harris in due course, since it is to his arbitrament that the substance of the disputes has been referred.

9. The Contracts of Carriage, under which the cargo was transported by Afrodite to the discharge port of Jeddah, were the Owners' Bs/L and, as material, they expressly provided for hire to be payable in accordance with the charterparty. As I understand the Bills of Lading issued at the first

loading port were not so endorsed. However the Bills of Lading for the cargo loaded at the second and third load ports, which embraces those relevant to these proceedings, were all so endorsed. Specifically that includes Bill of Lading XJ12.

10. Following redelivery of the ship from the charter service, there remained a substantial balance of hire due to Afrodite under the terms of the charterparty of USD 585,453.31 and, save that Afrodite has managed to attach a modest sum of money belonging to Shine Star, there is no prospect that they will be able to obtain a recovery from Shine Star, without incurring disproportionate costs. Shine Star is in liquidation and I have been informed by Afrodite's Singapore lawyers, Haridass Ho & Partners, that the liquidator has indicated, in advance of issuing a statement of affairs, that, so far, he has only been able to locate assets of approximately SGD 30,000 in cash belonging to Shine Star, whereas he is facing claims estimated to total SGD 10 million.

11. Since Afrodite considered that they had a contractual right to claim hire from the Shippers of the cargo loaded on board their ship at the second and third ports of loading in China, a view with which I concur, they instructed my company to commence arbitration proceedings and those proceedings were initiated against Ningbo, Shenyang, Benxi and Rilico respectively. In each case my company, acting on behalf of Afrodite, appointed Mr. Bruce Harris as arbitrator. Benxi and Rilico failed to duly appoint their own arbitrator and, in consequence, Mr. Bruce Harris has been appointed as sole arbitrator in the references relative to those two Shippers. (I should note that Benxi has only produced one of the notices sent to them, my company's fax dated 17th September 2007. In fact the proceedings had been commenced by notice dated 23rd July 2007. A true copy of that Notice is exhibited at "RAH5" hereto, together with a true copy of the further Notice dated 26th September 2007, appointing Mr. Bruce Harris as sole arbitrator. Mr. Harris then wrote to the parties on 28th September 2007, to confirm that he was duly appointed as sole arbitrator.)

12. However Ningbo and Shenyang instructed London solicitors, Reed Smith Richards Butler, and, on their behalf, Mr. Alan Oakley was appointed as arbitrator by those solicitors.

13. The arbitration proceedings progressed against Ningbo and Shenyang, where, by agreement, the two arbitration references were consolidated. There the London solicitors, who had been instructed, applied to the arbitrators for the determination of a preliminary issue on the question:

> "Whether as a matter of the true construction of the Bills of Lading signed by the Master {+i.e. what we have termed "the Owners' bills"}, the Shippers can in principle be liable for any hire due under

the time charter dated 23 March 2007 between the Owners and Shine Star see Transport Pte. Ltd."

(In fact the arbitrators had also suggested that a second preliminary issue should be determined, but, on mature reflection, they decided no to proceed to answer that question.)

For the reasons given by the arbitrators, they determined the preliminary issue in Owners' favour. Their determination was that, as a matter of English law, the Owners were entitled, in principle, to maintain a claim for hire under the Owners' Bs/L, which were, to all intents and purposes, in identical terms to the terms of Bill of Lading XJ12. A true copy of the signed original copy of the award and reasons in that reference is attached marked "RAH6". The original copy of the award is held in London by Jackson Parton, solicitors, who act as my company's correspondents. The original award was sent to Reed Smith Richards Butler, who had provided the arbitrators with an undertaking to pay for the cost of the award.

14. The arbitration proceedings involving Ningbo and Shenyang are now proceeding to determine whether, on the facts of the case, the Owners' claim will succeed. Claim submissions have been served and, last week, the defence submissions were served. I emphasise that that is a determination which is solely for the appointed arbitrators and it will principally depend upon an evaluation of the factual evidence as to the circumstances in which the Owners' Bs/L were issued.

15. So far as Rilico are concerned, they appointed the Singapore office of Ince & Co., another London firm of solicitors, following the attachment of certain funds of theirs in these proceedings. In correspondence with Ince & Co., I have suggested that the arbitration proceedings against their clients should be held in abeyance, to abide the outcome of the proceedings with Ningbo and Shenyang. Ince & Co. are still considering that proposal with their clients.

16. If I had notice of an opponent lawyer to correspond with, I would have proposed a similar arrangement to Benxi. The issues are likely to be very similar to, if not identical with, the issues in the consolidated reference involving Ningbo and Shenyang, and it may be that both Rilico and Benxi would accept the inevitability of the outcome, if Afrodite succeed in their claims against Ningbo and Shenyang. In the absence of a response, I am now progressing the arbitration reference against both Rilico and Benxi. As Benxi have deliberately ignored Afrodite's demand for arbitration and failed to appoint their arbitrator, I am proceeding to serve claim submissions in the hope that this may result in some sensible procedural agreement. While the factual issues may differ, the legal issues will be virtually identical in respect of each claim.

## THE CLAIM AGAINST BENXI

17. It follows from what I have said above that I totally reject the suggestion made in the memorandum of law filed by Benxi that Afrodite have no legitimate basis for their claim for hire against Benxi. As the determination of the arbitrators, to which I have referred, establishes, the Owners are entitled in principle to pursue such a claim for hire, because the contract of carriage, to which the Owners were party, namely the authorised Bills of Lading, expressly provides for hire under the charterparty to be payable. As a matter of English law, the agreement of the parties will be given effect to, absent specific grounds, such as illegality, which do not arise in the present case.

18. In light of the arbitrators' determination in the consolidated reference involving Ningbo and Shenyang, the only real issue, which is an issue properly for determination by the arbitrators in London, is as to whether, as a matter of fact and/or law, they agreed to the terms of the Owners' Bs/L. If they did, by whatever means, i.e. by express agreement of themselves or their authorised agents or by a deemed agreement, it will follow as night follows day that Afrodite were entitled to an award against them for hire, together with interest thereon and costs. A peripheral issue may arise as to whether Afrodite is entitled to claim the whole of the outstanding hire from each Shipper. In my submission, on the wording endorsed on the Owners' Bs/L, there can be little doubt that each Shipper is liable for the full hire, with rights of contribution from the other Shippers, whose cargo has been carried to destination. Each Bill of Lading is a separate contract, under which the Owners are entitled to receive hire due under the charterparty.

19. Benxi, in their memorandum of law, have referred the Court to an extract from Scrutton on Charterparties, a leading English maritime law text book, and to a decision of the Commercial Court in London, the "Cebu" (no.2) (1990) 2 Lloyd's Rep. 316. I must respectfully submit that these are of no assistance to the Court in relation to the issues before the Court. It is without doubt that remuneration payable under a time charter is called "hire". That is not in issue. In this case the charterparty so provides expressly and, of course, it is that very hire which, in accordance with the express terms of the Owners' Bs/L, is payable to Afrodite thereunder.

20. The decision in the "Cebu" (no.2) is factually distinguishable and is of no assistance to the Court. In "Cebu" (no 2), the language creating the lien under the charterparty expressly used the terms "all sub-freights." The present case, by contrast, is concerned with the express provisions of one of the Owners' Bs/L, which subjects Benxi, as the shipper of the cargo, to payment of hire. The reasoned decision of the arbitrators in the consolidated reference with Ningbo and Shenyang explains why, in principle, Afrodite's claim is good, as a matter of English law. I need

hardly point out that Mr. Bruce Harris, the sole arbitrator in the reference with Benxi, was one of the Tribunal that made that earlier determination as against Ningbo and Shenyang. He is, therefore, almost certain to reach the same conclusion as against Benxi on the materially identical wording of Bill of Lading XJ12. The reasoning in that earlier award is therefore equally relevant to the claim against Benxi.[1]

21. Benxi refer in their application to the contractual arrangements they had for the sale of the cargo. Respectfully that is entirely irrelevant to the contract between Benxi, as Shipper, and Afrodite, as Owner, which is contained in Bill of Lading XJ12 or is evidenced thereby.

22. I would respectfully submit that, as a matter of English law, Afrodite have a good prima facie claim against Benxi to recover unpaid hire due under the charterparty. In that regard, it may assist the Court to have sight of the claim submissions served on behalf of Afrodite in the consolidated arbitration proceedings involving Ningbo and Shenyang, Exhibit "RAH7" hereto.

## QUANTUM OF SECURITY

23. It is my understanding that Afrodite are entitled to be secured for their best reasonably arguable case. In my submission that entitles them to security for the whole of the outstanding hire due on termination of the charterparty, USD 585,453.31, supplemented by increments for interest and costs. In my respectful submission Afrodite are not over-secured and the attachment order should not be dismissed or varied.

Executed in Piraeus, Greece

21st March 2008

By R. A. Hewett
Roy Albert Hewett