UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------
AFRODITE SEA TRADE S.A.

                    Plaintiff

- against -

SHINE STAR SEA-TRANSPORT PTE LTD
NINGBO MINMETALS & MACHINERY
IMP. & EXP. CORP., SHENYANG SANYO
BUILDING MACHINERY CO. LTD., BENXI
NORTHERN STEEL PIPES CO. LTD. and
RILICO SINGAPORE PTE. LTD.

                    Defendants
-------------------------------------------------------


THIS IS THE EXHIBIT MARKED
"RAH 7"



# HEWETT & CO
MARINE CLAIMS ADJUSTERS

Bruce Harris Esq.,  
London.  
BY EMAIL

c.c. Alan P. Oakley Esq.,  
Hertfordshire.  
BY EMAIL:

c.c. Reed Smith Richards Butler,  
London.

Attn: Ms. Antonia Panayides

BY EMAIL: apanayides@reedsmith.com

Our Ref.:   ALT/23.3.07/RAH

Date:   28 January 2008

Yr Ref:   MTO/AP/CLW/999921.50001

Dear Mr. Harris,

### "ALTAIR" – CP 23.3.07 – Bs/L: XJ10 & XJ28

Following publication of the Tribunal's Interim Declaratory Award, it has been agreed with our opponents that the reference should proceed with service of claim submissions by the Owners. Accordingly, we would be grateful if you would accept this letter as constituting our clients' Claim Submissions in the reference.

We will adopt the same definitions in these submissions as were adopted in the submissions leading up to the Tribunal's Interim Declaratory Award. We will also refer to the documents, which have been submitted in that segment of the reference. Indeed we hope that we can abbreviate these submissions by making reference to our submissions dated 16th October 2007 in relation to the preliminary issue determined by that award.

We will endeavour to follow the same sequence as with those earlier submissions.

71 NOTARA STREET, PIRAEUS 185 35 GREECE  
TEL.: (+30) 210 4138 660 (5 LINES), FAX: (+30) 210 4138 664  
E-MAIL: hewett@otenet.gr

A. <u>The terms of the Bs/L</u>

1. The relevant Bs/L are those signed by the Master, needless to say. In paragraph 2 of the reasons for their interim declaratory award, the Tribunal indicated that they were then only concerned with the Owners' bills and, in our submission that remains the case. If the Charterers issued what respectfully must be fraudulent Bs/L (the clean Shine Bs/L), naming themselves as carrier, that is nothing to do with the Owners, nor is it of anything other than passing interest, so far as the issues that arise between the Owners and the Shippers are concerned.

2. We are sure that it is unnecessary for us to repeat the relevant wording of the Owners' Bs/L, which is set out at paragraph A2 of our submissions dated 16th October 2007, as that wording is also repeated at paragraph 2 of the reasons for the Interim Declaratory Award.

3. The Tribunal has now determined, in abstract terms, that that wording is man enough to permit the Owners to maintain the claim which they advance in this reference. In our submission, that is really the end of the liability issue, so far as the Shippers' liability for unpaid hire is concerned.

4. However, from the Tribunal's initial proposal for a second preliminary issue, we trust that we appreciate correctly that the Tribunal is concerned to ensure that the words endorsed upon the Owners' Bs/L were part of the agreed terms of the contract of carriage. With that in mind, we expend a little more effort in explaining to the Tribunal how it is that the endorsement was indeed an agreed part of the contract of carriage, alternatively the basis upon which the Shippers are no longer in a position to assert otherwise.

5. May we emphasise that the charterparty is a trip time charter for the carriage of cargo from North of China to Jeddah. By the time that the ship commenced loading of the relevant cargo, the Owners had already become deeply concerned by the performance of the Charterers. There were problems over payment of hire and, indeed, hire was outstanding at that time. Promises had been made, which had not been met. The Owners had heard, via the broking channels, that other Owners had problems with regard to payment of hire. It was for that reason that Mr. Missiris, the Managing Director of Dilek Transport Inc., the Owners' Managers, gave instructions to

2

the Master for the endorsement to be made, not only on the Owners' Bs/L, but also upon the Mates Receipts, as you will have seen at A5 and A9 to the submissions dated 16th October 2007. A statement from Mr. Missiris will be made available on exchange of witness evidence. It is to be noted that the documents, as customary, were prepared by Shine's agents, who would have had contact with the Shippers and/or their forwarding agents and, again, disclosure of relevant documents is requested.

6. As Mr. Missiris will explain, he was also concerned, and, as it has evolved, correctly concerned, that the remarks endorsed upon the Mate's Receipts, as to the condition of the cargo, would not be reflected in the Bs/L, which were released to the Shippers. It was for that reason, in particular, that Mr. Missiris instructed Holman Fenwick and Willan in Shanghai to prepare a form of receipt, against which the original Owners' Bs/L, signed by the Master of the ship would be released to the Shippers.

7. In fact the original Bs/L were released by Owners' agents in Shanghai, World Marine, to the forwarding agents representing each of the Shippers of cargo on m.v 'Altair" against signature on behalf of the Shippers of formal receipts for the Owners' Bs/L. The relevant receipts are at B1 and B2 to the submissions dated 16th October 2007.

8. The relevant passage of the receipt, signed for Bs/L XJ10 by Universal Freight System Tianjian and for Bs/L XJ 28 by Tianjian Sheng Tang Cargo Agency Co. Ltd., reads:

   > "We hereby confirm receipt of the original B/L        (in three sets) issued by the Master of "Altair".
   > We also acknowledge the above original signed by the Master of the "Altair" who is the only authorised signatory for the Bs/L according to the C/P dated 22.3.07"

9. The Shippers, through their forwarding agents, obtained release of the original Owners' Bs/L for their cargo against that confirmation and acknowledgement. They thereby agreed that the original Owners' B/L in each case, signed by the Master, was the only genuine B/L. It need hardly be emphasised that the Owners' B/L contained the endorsement under which the claim for hire is advanced.

3

10. If the Owners' Bs/L did not represent the agreed terms, there would have been an immediate complaint from the Shippers, protesting the terms of the Bs/L. There was no such complaint made to Owners. Instead what the Tribunal finds is that the Charterers issued clean Bs/L, which did not correspond with the Mate's Receipts.

11. In our submission, the likely reason for the issue of the clearly fraudulent Shine Bs/L is that the Shippers complained to the Charterers as soon as they saw, firstly, the remarks placed on the Mate's Receipts and, subsequently those placed upon the Owners' Bs/L as to the condition of the cargo. We can think of no other reason why the Charterers should issue clean Bs/L. It was no skin off their nose if the Bs/L accurately described the cargo and, of their own volition, they had no reason to take on such a liability. (We should perhaps emphasise that the cargo claim advanced against the Owners by reference to B/L XJ28 is precisely in respect of the pre-shipment damage, which should have been endorsed on the Shine version of that B/L). However we call for full and complete disclosure of all documentation passing between the Shippers, their forwarding agents and the Charterers, in relation to the issue of both sets of Bs/L, when the Defence Submissions are served. In the absence of such disclosure, we will invite the Tribunal to draw the obvious but but necessary, adverse inferences.

12. In the submissions relating to the preliminary issue, it was suggested on behalf of the Shippers that they had no knowledge of the Owners' Bs/L. That is demonstrably false. The original Owners' Bs/L were released to the Shippers' forwarding agents against the signature of the form of receipt. It is inconceivable that the forwarding agents did not inform their principals, but, whether they did or not is irrelevant. Knowledge of the forwarding agents is imputed knowledge of the Shippers.

13. Obviously however, since we are told that freight was paid by the Shippers to the Charterers, there must have been a contract in force between the Shippers and the Charterers, which probably pre-dates the commencement of loading. Again we call for disclosure of all documentation in relation to such contract.

14. Accordingly it follows that there was no antecedent contract between the Shippers and Owners, such that there could be any debate as to whether the Owners' Bs/L in each case represented the terms of the contract of carriage. We refer the Tribunal to the

4

contents of paragraphs 3-001/6 of Carver on Bills of Lading (Second Edition). (Copies will be sent separately to your co-arbitrator, but, if you require copies, please say so). The Tribunal will note, that, even in the case of an antecedent contract between the Shippers and the Owners, the probability is that the terms of the Bs/L will prevail;

> "None of these points however rules out the <u>probability</u> that the terms of the Bill will, in most cases, prevail, even between Shipper and Carrier, over those of the antecedent contract between them; and a variety of legal reasons can be given to account for this result. (There then follow instances where the antecedent contract so provides). The Bill of Lading may likewise "supersede" the original or antecedent contract even though that contract does not expressly so provide; this result can be explained either by reference to an implied term to this effect in the antecedent contract or on the ground that the parties have by their subsequent agreement novated that contract into a new one on the terms of the bill of lading. Where the circumstances thus support the view that the parties intend the bill of lading terms to prevail over those of the antecedent contract, there seems to be little, if any, practical difference between saying that the bill of lading "contains", and saying that it merely "evidences" the contract of carriage...." (Our emphasis).

If that is the position where there is an antecedent contract between the parties, a fortiori the probability must be that the terms of the Owners' Bs/L must prevail, where there is no antecedent contract between the parties.

15. Here, quite clearly, there was no antecedent contract between Owners and Shippers, because it was the Charterers who had arranged for the carriage, pursuant to their contract for the use of the ship. So the only evidence of the terms upon which the Owners were prepared to carry the Shippers' cargo to destination is contained in the Owners' Bs/L and that conclusion is reinforced by the circumstances in which the Bs/L were released to the Shippers' forwarding agents.

16. Even if the Tribunal is unpersuaded that, as a matter of agreement, the terms of the Owners' Bs/L must prevail, the circumstances, in which those Owners' Bs/L were released, give rise to the clearest possible estoppel in Owners' favour. The Shippers had received the Owners' Bs/L, which, as Mr. Missiris will state, represented the

5

terms upon which the Owners were prepared to carry the cargo to destination. They said nothing, but allowed the Owners to prosecute the voyage and, in doing so, in particular given the confirmation and acknowledgement given to the Owners, it would now be inequitable for the Shippers to deny that their cargo had been carried on the terms set out in the Owners' Bs/L. Certainly there will be irremedial prejudice to the Owners, if the Shippers are to be allowed to contend that they did not so agree, after the voyage was concluded.

17. Perhaps the only other issue which we should touch upon, because the Tribunal, in paragraph 14 of the reasons for its Interim Declaratory Award has mentioned the possible difficulties, is the question of how much hire is payable by each Shipper. In our respectful submission the full amount of hire payable under the charterparty, is payable by each shipper. That is what the endorsement on the Owners' Bs/L says and there is no reason for the Tribunal to interfere with the clear wording of the contracts contained in or evidenced by the Owners' Bs/L.

18. While we can conceive that the position could just be different in relation to a claim for demurrage, since the charterparty provisions could perhaps be applied to loading or discharge of the specific cargo, that cannot be the case with regard to the payment of hire. Hire is unrelated to individual parcels of cargo. It is the payment for the use of the ship. In this case it is specifically the use of the ship for this cargo-carrying voyage from North China to Jeddah. Of course, since, in our submission, each and every one of the cargo Owners is liable for the hire in full, it is likely that rights of contribution will arise inter se. That is quite another matter however, which need not concern this Tribunal.

19. There is no authority which stands against the true construction of the Owners' Bs/L and, thereunder, hire is payable. Although our opponents criticized the reliance that we sought to place upon the "Constanza M" (1981) 2 Lloyds Rep. 147, we would respectfully submit that that case is very much to point. It was not cited to suggest that freight and hire are inter-related words, although, equally, our opponents, have omitted to bring to the Tribunal's attention, in relation to that submission of theirs, the judgment in the "CEBU" (No.1), which is in conflict with the "CEBU" (No.2) and which is referred to in the transcript of that judgment (Care Shipping v. Itagrani Export S.A.). (In our respectful submission, while it must be hoped that sooner or later there will be better

guidance on the effect of the lien clause, the judgment of Lloyd J (as he then was) is consistent with binding authority and is to be preferred. It is not our understanding that it is the task of a first instance judge to depart from House of Lords authority on the basis of changed circumstances; and, unless we are in error, that is surely a ground upon which the House of Lords alone, under its own Practice Directions, is entitled to depart from its own earlier decisions.) However our purpose in citing that case to you was to refer to the incorporating wording which had been adopted;

> "Freight " payable according to Terms/Conditions/Exceptions ofC.P 18.1.79....".

Such wording, in that case, made the endorsee of the B/L liable for charterparty freight, in circumstances when they had paid 90% of the freight due to the sub-charterers, the equivalent of Shine Star in this case. There is simply no difference in principle between the liability of the endorsees of the Bs/L to pay charterparty freight in that case and the liability of the Shippers, in the present case, to pay charterparty hire. The incorporating wording has that same effect. The wrong-doing of the Charterers is the same in both cases.

20. We should just respond to 2 earlier submissions of the Shippers, that the insertion of the word "hire" was a mistake or a typographical error (respectively paragraphs 8 and 14 of the reply submissions in relation to the preliminary issue, dated 7th November 2007) and that there was a shared assumption that freight was payable by the Shippers, such as to give rise to an estoppel by convention.

21. As to the first assertion, the answer will be seen in the statement of Mr. Missiris. The insertion of the relevant wording was quite deliberate, on his part, and was made on his instructions. As the Tribunal has pointed out in the Reasons for its Interim Declaratory Award, the incorporated charterparty is a time charter, under which "hire" not "freight" is payable. The assertions are demonstrably wrong. There was no mistake or typographical error. So, too, is the latter assertion of a shared assumption unsustainable. As a matter of common sense the Owners did not proceed on the basis of an assumption that freight was payable. They proceeded to carry the cargo to destination and to deliver it there on the basis of the express terms of the Owners' Bs/L, by which alone the parties to this reference undertook contractual obligations towards each other.

22. We are not sure that any of the remaining issues raised previously will survive the Tribunal's Interim Declaratory Award. Certainly commercial repugnancy has been addressed and determined by the Tribunal in the context of the preliminary issue. Perhaps, therefore, for the present, we can confine ourselves to emphasizing that the only authorized Bs/L under the charterparty were the Owners' Bs/L (Clause 46), in that (a) they were signed by the Master and (b) they were in strict conformity with the Mate's Receipts.

23. So in our submission, the liability of the Shippers is clear and is wholly in accordance with the abstract determination of the Tribunal in the Interim Declaratory Award.

B. The claim

1. So far the Tribunal has been faced only with issues as to liability. We must now turn to consider the extent of the Owners' claim.

2. Attached hereto marked "Z" is a statement as at the determination of the charterparty, which establishes the hire outstanding under the charterparty. We should indicate that the statement is in slightly different form from what the Tribunal would normally expect to see as a final hire statement. That is because the Owners have applied the payment made by the Charterers for the bunkers on delivery against such bunkers, as they are fully entitled to do. Indeed the Charterers made that clear with their first statement, copy attached marked "Y". On that basis, the hire payable to Owners totals USD 585,453.31, and it is that sum which the Owners claim against each of the two Shippers in these consolidated proceedings.

3. That sum is calculated in accordance with the terms of the relevant charterparty and it is appropriate, at this juncture, that we refer you to the terms of the charterparty, which you will find at page 10 of the attachments to the Shippers' claim submissions in relation to the preliminary issue. Basically we do not need to refer you to more than clause 4, which sets out the rate of hire payable, namely USD 27,000 per day. It is of no particular relevance, in the context of this reference, that the hire should have been paid every fifteen days in advance, in accordance with clause 50. Clause 50, in turn, provides the Owners' banking details.

4. For the present purposes we do not think it is necessary to elaborate further. Mr. Missiris will confirm that the hire, as shown in the Owners' statement, is due and owing.

5. Since, in our submission, the terms of the Owners' Bs/L subject the Shippers to liability for the hire payable under the charterparty, we invite an award in Owners' favour for that full amount against both Shippers, Respondents to these proceedings, jointly and severally.

C. Conclusion

1. Accordingly, we request an award in Owners' favour for the sum of USD 585,453,31, by way of unpaid hire payable under the terms of the Owners' Bs/L.

2. In addition we seek an award of interest on that sum at such compound rate as the Tribunal shall think appropriate. In our submission, although there may be grounds for suggesting that interest on part of the sum due should run from an earlier date, we invite an award that interest should run from the date of redelivery, 29th June 2007, until the date of actual payment, on the basis that the hire was payable in advance.

3. The Owners request an award of the costs of the arbitration, save for the costs in connection with the determination of the preliminary issue, which have already been awarded by the Tribunal's interim declaratory award.

We now await service of the Shippers' Defence Submissions, which, in accordance with directions agreed between the parties, are due within 14 days. We regret that those submissions are served later than had been agreed, due to the writer's recent health problems, and we should apologise to all concerned.

Yours truly,

Hewett & Co.

9


## 星辉海运（私人）有限公司
### SHINE STAR SEA TRANSPORT PTE., LTD.

To:     AFRODITE SEATRADE S.A.
C/O:    IFCHOR
From:   Shine Star Sea Transport Pte Ltd.

RE:     MV ALTAIR / CP

**Statement of Account**                                2007-4-9

| 1ST HIRE | | Delivered on 2007-4-4 06:00GMT | | Debit USD | Credit USD |
|---|---|---|---|---|---|
| 1. Hire | | | | | |
| | from | 2007-04-04 06:00 GMT | | | |
| | to | 2007-04-19 06:00 GMT | | | |
| | 15 days at | US$27,000.00 per day | | 405,000.00 | |
| 2. ADDRESS COMM | | | 5.00% | | 20,250.00 |
| 3. C/V/E | | | | | |
| 15.0000 days at | | US$1,300.00 PMPR | | 650.00 | |
| 4. B.O.D. | IFO | 603.425 Mts | 364.00 PMT | 219,646.70 | |
| | MGO | 153.721 Mts | 594.00 PMT | 91,310.27 | |
| 5. ON-HIRE SURVEY | | | US$800.00 | | 400.00 |
| | | to be shared by owrs/chtrs in 50% | | | |
| 6. RDLY BONUS | | | | 108,000.00 | |
| | | | TOTAL | 824,606.97 | 20,650.00 |
| | | | Due to Owners | **803,956.97** | |

To: Owners Banker account asf:

# AFRODITE SEATRADE S.A
C/O

**3,Irodotou street., Piraeus 185 38, Greece**

**Phone :** + 30 210 4182157
**Fax    :** + 30 210 4183426
E-mail: dilek@hol.gr

Piraeus, 18.01.08

**"ALTAIR" – C/P 23.3.07**
**FINAL HIRE STATEMENT**

|  | USD |
|---|---|
| Hire from 04/04/07 0600hrs GMT to 28/06/07 1900hrs GMT 85.5417 days at USD 27,000 PDPR | 2,309,625.90 |
| Less 5 pct comms (excl. Velos) | (115,481.30) |
| Plus nett redelivery bonus | 108,000.00 |
| Plus bunkers on delivery: |  |
| IFO 603.425 MTS at USD 364 PMT | 219,646.70 |
| MGO 153,721 MTS at USD 594. PMT | 91,310.27 |
| Less |  |
| Payment for bunkers on delivery | (310,956.97) |
| Plus C/V/E at USD 1,300 PMPR | 3,706.81 |
| Plus pre-loading expenses (estimated) | 15,000.00 |
| Plus ILOHC | 5,000.00 |
| Less Owns share fr on hire survey | (400.00) |
| Less Owns share fr off hire survey | (500.00) |
| Less bunkers on redelivery: |  |
| IFO 120.624 MTS at USD 364 | (43,907.14) |
| MGO 15.09 MTS at USD 594 | (30,941.46) |
| Sub-total | 2,250,102.81 |
| Less Charts' payments | (1,664,649.50) |
| Net hire due to Owners | 585,453.31 |

AFRODITE SEATRADE S.A.
MONROVIA - LIBERIA